KIRTON McCONKIE
Brinton M. Wilkins (AZ Bar No. 024591)
50 East South Temple, 4th Floor
P.O. Box 45120
Salt Lake City, Utah 84145-0120
Telephone:  (801) 328-3600
Facsimile:  (801) 321-4893
bwilkins@kmclaw.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SOFT WAVE INNOVATIONS, INC., an Arizona corporation,<br><br>        Plaintiff,<br>vs.<br><br>AMERICA GREENER TECHNOLOGIES, INC., a Nevada corporation; CARRIE BORGEN and JOHN DOE BORGEN, husband and wife; RICARDO ANTONIO BARBOSA and JANE DOE BARBOSA, husband and wife; JAMES MACK and JANE DOE MACK, husband and wife; JOHN P. MOONEY and JANE DOE MOONEY, husband and wife; JOHN and JANE DOES 1-100; JOHN DOE CORPORATIONS 1-10; and OTHER JOHN DOE ENTITIES 1-10,<br><br>        Defendants. | **COMPLAINT**<br>**AND**<br>**JURY DEMAND**<br><br>No._____ |

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Soft Wave Innovations, Inc. ("SWI"), is an Arizona corporation.

2.      Upon information and belief, Defendant America Greener Technologies, Inc. ("AGT") is a Nevada corporation and is properly registered in Arizona as a foreign corporation authorized to do business in Arizona.

3.      Upon information and belief, Defendant Carrie Borgen is now, and at all times relevant to the allegations in this Complaint was, a resident of Maricopa County, Arizona.  She is now, and at all times relevant to the allegations in this Complaint was, doing business in Maricopa County and was directly involved in and controlled all events and conduct alleged in this Complaint.

4.      Upon information and belief, Carrie Borgen is or was married to John Doe Borgen during all times relevant to the allegations in this Complaint, and Carrie Borgen took all actions alleged in this complaint for her own benefit and for the benefit of her marital community with John Doe Borgen.

5.      Upon information and belief, Defendant Ricardo Antonio Barbosa is now, and at all times relevant to the allegations in this Complaint was, a resident of Maricopa County, Arizona.  He is now, and at all times relevant to the allegations in this Complaint was, doing business in Maricopa County and was directly involved in and controlled all events and conduct alleged in this Complaint.

6.      Upon information and belief, Ricardo Antonio Barbosa is or was married to Jane Doe Barbosa during all times relevant to the allegations in this Complaint, and Ricardo Antonio Barbosa took all actions alleged in this complaint for his own benefit and for the benefit of his marital community with Jane Doe Barbosa.

7.      Upon information and belief, Defendant James Mack is now, and at all times relevant to the allegations in this Complaint was, a resident of Maricopa County, Arizona.  He is now, and at all times relevant to the allegations in this Complaint was, doing business in Maricopa County and was directly involved in and controlled all events and conduct alleged in this Complaint.

8.      Upon information and belief, James Mack is or was married to Jane Doe Mack during all times relevant to the allegations in this Complaint, and James Mack took all actions alleged in this complaint for his own benefit and for the benefit of his marital community with Jane Doe Mack.

9.      Upon information and belief, Defendant John P. Mooney is now, and at all times relevant to the allegations in this Complaint was, a resident of Maricopa County, Arizona.  He is now, and at all times relevant to the allegations in this Complaint was, doing business in Maricopa County and was directly involved in and controlled all events and conduct alleged in this Complaint.

10.     Upon information and belief, John P. Mooney is or was married to Jane Doe Mooney during all times relevant to the allegations in this Complaint, and John P. Mooney took all actions alleged in this complaint for his own benefit and for the benefit of his marital community with Jane Doe Mooney.

11.     Defendants John and Jane Does 1-100 are, upon information and belief, individuals that worked in concert with the named defendants relative to the facts and causes of

3

action at issue in this Complaint and are liable for some or all of the actions and damages alleged below.

12.     Defendants John Doe Corporations 1-10 are, upon information and belief, corporations that worked in concert with the named defendants relative to the facts and causes of action at issue in this Complaint and are liable for some or all of the actions and damages alleged below.

13.     Defendants Other John Doe Entities 1-10 are, upon information and belief, corporations that worked in concert with the named defendants relative to the facts and causes of action at issue in this Complaint and are liable for some or all of the actions and damages alleged below.

14.     Plaintiff's claims are primarily based upon questions of federal law and substantially arose in the State of Arizona.

15.     Therefore, jurisdiction and venue as to all parties is proper under 28 U.S.C. § 1331 and venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

16.     This Court has supplemental jurisdiction over the Plaintiff's state law claims under 28 U.S.C. § 1367.

## <u>GENERAL ALLEGATIONS</u>

17.      AGT is a privately owned corporation that provided a chemical solution to control the buildup of coal ash in boilers for power plants.

18.     Carrie Borgen was AGT's Chief Financial Officer.

19.     Ricardo Antonio Barbosa was AGT's Chief Operating Officer.

4

20. James Mack was a member of AGT's Board of Directors.

21. John P. Mooney was a member of AGT's Board of Directors.

22. SWI is a privately owned corporation that provides water treatment services to commercial clients.

23. Gary Wilson is an inventor and is SWI's president.

24. Gary Wilson invented a water treatment device that uses electro-magnetic fields to create a multi-vibrational field that treats water flowing through a pipe.

25. After inventing that device, Gary Wilson and Mike Brown patented it and it is registered with the U.S. Patent Office as Patent No. 8,477,003 (the "Patent").

26. In 2014, AGT desired to expand its business presence and approached SWI and Gary Wilson about acquiring the Patent as part of a joint venture.

27. As part of the negotiations for the Patent's acquisition and the joint venture, several meetings were held.

28. Gary Wilson and his wife, Tammie, and Mike Brown and his wife, Claudia Brown, attended a meeting at Gary Wilson's home in Dolan Springs, Arizona, as did James Mack and Michael C. Boyko, AGT's CEO.

29. At the meeting at Gary Wilson's house in early July 2014, several representations were made to Mr. Wilson, Mr. Brown, and SWI.

30. Specifically, Mr. Mack and Mr. Boyko made the following representations and promises:

a.   That upon the acquisition of the Patent and implementation of the proposed joint venture, AGT's stock price would immediately jump to between $10 and $15 per share;

b.   That AGT had lined up contracts with three power plants who were ready to sign with AGT as soon as AGT acquired the Patent;

c.   That AGT had lined up investors who were ready to invest substantially in AGT as soon as AGT acquired the Patent and implemented the joint venture;

d.   That AGT was ready to deploy the Equipment worldwide as soon as AGT acquired the Patent and implemented the joint venture;

e.   That Gary Wilson would receive royalties from the Patent and profits from the joint venture.

31.   Based upon the representations of AGT and its representatives, SWI worked in good faith toward the execution and implementation of the anticipated joint venture agreement.

32.   Indeed, in September 2014, and in accordance with the plan to enter a joint venture, Gary Wilson and Mike Brown assigned the Patent to AGT, anticipating that a joint venture agreement would be executed shortly thereafter.

33.   In October 2014, however, AGT came to Mr. Wilson and stated that it would no longer be able to enter a joint venture.

34.   In place of the joint venture, AGT proposed purchasing all of SWI's assets, including SWI's customer contracts, trade names, inventory, tools, parts, and demonstration contracts (the "Assets").

6

35.    In return for the Assets, Mr. Boyko, Ms. Borgen, Mr. Barbosa, Mr. Mack, and Mr. Mooney, acting on AGT's behalf, promised that SWI would receive AGT stock worth approximately $1 per share.

36.    To help facilitate the acquisition of the Assets, AGT formed AGT Soft Wave, Inc. ("AGT Soft Wave"), which is a wholly owned subsidiary of AGT.

37.    On October 31, 2014, AGT and AGT Soft Wave, on the one hand, and SWI, on the other, executed an Asset Purchase Agreement (the "APA"), under which SWI sold the Assets to AGT Soft Wave.  A true and correct copy of the APA is attached as Exhibit 1.

38.    According to Section 2 of the APA, the "purchase price for the Assets . . . is Seven Hundred Seventy-Five Thousand (775,000) shares of the common stock . . . of AGT."

39.    At the time of executing the APA, AGT and Mike Boyko—under the direction and control of Ms. Borgen, Mr. Boyko, Mr. Barbosa, Mr. Mack, and Mr. Mooney—told Gary Wilson and SWI that AGT's stock was valued at $.99 per share.

40.    Upon information and belief, AGT had 15 million authorized shares at that time, which would value the company at around $15 million.

41.    Thus, acting in reliance upon these representations, SWI executed the APA and sold the Assets to AGT, thereby acquiring 775,000 shares of AGT's common stock, which—according to AGT's representations to Mr. Wilson—was worth $767,250.00.

42.    Not only did Mr. Boyko negotiate the purchase of the Assets and tell SWI that AGT's stock was valued at $.99 per share, he directed and oversaw the APA's drafting and execution.

43.     AGT's stock, however, was not worth $.99 per share on October 31, 2014, as had been represented to SWI at the time it executed the APA.

44.     In a Form 8-K report that AGT filed with the U.S. Securities and Exchange Commission in connection with the APA, AGT stated:

> On October 31, 2014 [AGT Soft Wave], a newly formed Nevada corporation that is [a] wholly-owned subsidiary of [AGT], acquired certain assets from [SWI] . . . in exchange for 775,000 shares of the common stock of [AGT] valued at $767,250 under the terms of [the APA]. . . .

A true and correct copy of the Form 8-K is attached as Exhibit 2.

45.     Thus, the Form 8-K indicates that the value of each AGT share of common stock SWI received was $.99 ($767,250 ÷ 775,000 = $.99).

46.     But according to the Form 8-K, on November 1, 2014—*i.e.*, one day after selling stock to SWI valued at $.99 per share—AGT

> sold an aggregate of 400,000 shares of our common stock at a purchase price of $.50 per share to two accredited investors in private transactions exempt from registration under the Securities Act. . . . We received proceeds of $200,000 and did not pay any commissions or finder's fees in these sales.  The proceeds are being used by us for general working capital.

*See* Ex. 2.

47.     Thus, according to the Form 8-K, between October 31, 2014, and November 1, 2014, the value of AGT's common stock plummeted from $.99 per share to $.50 per share, which totaled a loss in value of $7,425,000.00.

48.     Aside from the one-day loss of nearly 50% of AGTs value, the history of AGT's stock value shows that AGT, its representatives, and controlling executives either did know or should have known that AGT's stock was not worth $.99 per share.

49.     For instance, on June 5, 6, 7, 10, 11, 12, 13, 16, 17, 18, 19, 20, 23, and 24 of 2014, AGT's stock traded for $.35 per share. On June 25, the stock dipped to $.34 per share. And by July 9, AGT's stock had sunk to $.30 per share.

50.     In other words, in the less than four months between July 9 and October 31, 2014, AGT's per share stock value more than tripled, and AGT went from being valued at $4,500,000.00 to being valued at $14,850,000.00.

51.     Upon information and belief, there were no significant events justifying that run-up in value, and the increase was solely the result of AGT illegally manipulating its stock value.

52.     The values outlined in paragraph 49 were AGT's actual share values during the July 2014 communications with SWI during which Mr. Mack and Mr. Boyko were promising, among other things, upon acquisition of the Patent and execution of the joint venture that AGT's stock would quickly jump to between $10 and $15 per share.

53.     In August 2014, AGT's stock had risen to $.80 per share, and the stock only rose to $.99 per share for the first time on October 29, two days before signing the APA.

54.     Upon information and belief, there was no significant event to justify the $.19 per share increase in value between October 29 and October 31, and that increase was the result of AGT illegally manipulating its stock value.

55.     As stated above, and as confirmed by AGT's own Form 8-K, a day after the APA was signed AGT's stock lost almost fifty percent of its value.

56.     Before executing the APA, no one from AGT or AGT Soft Wave ever told Gary Wilson or anyone representing SWI that the run-up in AGT's stock value was a recent phenomenon and that during July 2014 the stock had been valued at $.30 per share.

57.     The true value of AGT's stock, and its manipulated run-up in value—all of which was or should have been known by AGT, its representative, executives, and board members—indicates that all named Defendants in this action intended to mislead SWI into exchanging the Assets for stock that was worth significantly less than represented to SWI.

58.     Furthermore, the history of AGT's assets and liabilities provides further evidence that AGT's statements and promises to SWI and Gary Wilson regarding AGT's stock price, and the events that would happen after AGT acquired the Assets, were not made in good faith and were made with the intent to mislead SWI into relinquishing its Assets to AGT.

59.     For instance, according to a Form 10-Q that AGT filed with the Securities and Exchange Commission on February 12, 2014, AGT's unaudited assets on December 31, 2013 totaled $650.00.  A copy of this Form 10-Q is attached as Exhibit 3.

60.     In a Form 10-Q that AGT filed on November 14, 2014, after the APA's execution, and which covered the period ending September 30, 2014, AGT disclosed that as of September 30, 2014 –*i.e.*, one month before transferring stock to SWI that AGT claimed was worth $.99 per share—AGT had experienced a net loss of $1,593,465.00.  A copy of this Form 10-Q is attached as Exhibit 4.

61.     Given that (a) less than a year before selling stock to SWI that AGT claimed was worth $.99 per share AGT had assets totaling $650, and (b) AGT's losses by the end of

September 2014 exceeded $1.5 million, the Defendants either knew or should have known that their promises and statements to SWI were false and misleading.

## FIRST CLAIM FOR RELIEF

### (Violations of the Arizona Securities Act—AGT and AGT Soft Wave)

62.     SWI realleges and incorporates herein by reference all of the other allegations set forth in this Complaint.

63.     The APA constituted an offer, sale, or purchase of a "security," as defined under the Arizona Securities Act (hereinafter the "Act"), A.R.S. § 44-1801(26).

64.     AGT and AGT Soft Wave promoted and secured the Plaintiff's investments in AGT Soft Wave by means of untrue statements of material fact or by omissions of fact which were necessary in order to make the statements made, in light of the circumstances, not misleading, including, among other things, that: (a) AGT's stock was valued at $.99 per share when immediately before and after the sale to SWI the same class of stock sold for $.50 per share; (b) there AGT's stock was set to jump to between $10 and $15 per share; (c) AGT had lined up contracts with three power plants who were ready to sign with AGT as soon as AGT acquired the Patent and executed the joint venture; (d) AGT had lined up investors who were ready to invest substantially in AGT as soon as AGT acquired the Patent and executed the joint venture; (e) AGT was ready to deploy the Equipment worldwide as soon as AGT acquired the Patent and executed the joint venture; and (f) Gary Wilson would receive royalties from the Patent and profits from the joint venture.

65.     AGT and AGT Soft Wave made material misrepresentations and omissions, with the intent and expectation that SWI would rely thereon.  The material misrepresentations and omissions by AGT and AGT Soft Wave were material factors in SWI's decision to execute the APA and invest in AGT Soft Wave.

66.     In making the decision to invest in AGT Soft Wave, SWI: (a) reasonably relied on the material misrepresentations and omissions of AGT, AGT Soft Wave, or their agents; and (b) would not have made that investment if AGT and AGT Soft Wave had truthfully disclosed all material facts incident to the anticipated transactions, including the true value of AGT's stock.

67.     AGT and AGT Soft Wave knew, or in the exercise of reasonable care should have known, of the false nature of the material misrepresentations and that they had failed to disclose material facts to SWI.

68.     The promises, assurances, and representations by AGT and AGT Soft Wave to SWI were false or untrue statements of material facts and deceptive omissions of material facts and constitute violations of A.R.S §§ 44-1991 and 44-1992 and directly and proximately caused SWI damages in an amount to be determined at trial.

69.     Pursuant to A.R.S § 44-2001, SWI has been damaged and is entitled to the consideration paid for the securities, together with interest, taxable court costs, and reasonable attorneys' fees.

70.     SWI is entitled to recover all civil penalties permitted under A.R.S. § 44-2037(A).

71.     Furthermore, the Defendants' violations of A.R.S §§ 44-1991 and 44-1992 were reckless or intentional and entitle SWI to an award of punitive damages.

## SECOND CLAIM FOR RELIEF

**(Control Person Liability Under A.R.S. § 44-1999(B)—Carrie Borgen, Ricardo Antonio Barbosa, James Mack, and John P. Mooney)**

72.     SWI realleges and incorporates herein by reference all of the other allegations set forth in this Complaint.

73.     Carrie Borgen, Ricardo Antonio Barbosa, James Mack, and John P. Mooney are control persons for purposes of A.R.S. § 44-1999(B).

74.     Indeed, they indirectly or directly controlled AGT and AGT Soft Wave in the perpetuation and communication of the false statements outlined in this Complaint and for which AGT and AGT Soft Wave are liable under the Arizona Securities Act.

75.     Accordingly, Carrie Borgen, Ricardo Antonio Barbosa, James Mack, and John P. Mooney are jointly and severally liable with and to the same extent as AGT and AGT Soft Wave for their violations of the Arizona Securities Act.

## THIRD CLAIM FOR RELIEF

**(Section 10(b) of the U.S. Securities Exchange Act and SEC Rule 10b-5 —AGT and AGT Soft Wave)**

76.     SWI realleges and incorporates herein by reference all of the other allegations set forth in this Complaint.

77.     As described above, AGT and AGT Soft Wave misrepresented material facts and omitted material information necessary under the circumstances to keep his statements from being misleading in connection with SWI's purchase of AGT stock.

78.     SWI was misled into believing, among other things, that AGT's stock was valued at $.99 per share when, in reality, it was worth half that.  The Defendants lead SWI to believe the artificially inflated stock price in order to obtain the Assets.

79.     Other false statements made by AGT and AGT Soft Wave include the statements that: (a) upon the acquisition of the Patent and the Assets, AGT's stock price would immediately jump to between $10 and $15 per share; (b) AGT had lined up contracts with three power plants who were ready to sign with AGT as soon as AGT acquired the Patent and executed the joint venture; (c) AGT had lined up investors who were ready to invest substantially in AGT as soon as AGT acquired the Patent and executed the joint venture; (d) AGT was ready to deploy the Equipment worldwide as soon as AGT acquired the Patent and executed the joint venture; and (e) Gary Wilson would receive royalties from the Patent and profits from the joint venture.

80.     None of the statements outlined above and elsewhere in this Complaint were true at the time they were made.

81.     Given the actual state of AGT's assets, liabilities, and stock value, AGT and AGT Soft Wave acted knowingly and recklessly, and with willful disregard of the truth in order to obtain SWI's Assets in exchange for AGT's stock.

82.     SWI justifiably and reasonably relied on AGT and AGT Soft Wave's representations and SWI would not have invested in AGT had SWI been aware of AGT's true stock value.

83.     AGT and AGT Soft Wave used instrumentalities of interstate commerce in connection with convincing SWI to purchase AGT stock.

84.     AGT's and AGT Soft Wave's conduct injured the Plaintiff.

85.     SWI's loss includes, but is not limited to, the nearly 50% reduction in the value of the AGT stock it purchased on October 31, 2014.

86.     As a direct and proximate result of the violation of § 10(b) of the Exchange Act and SEC Rule 10b-5, the Defendants have damaged SWI in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

## **FOURTH CLAIM FOR RELIEF**

**(Control Person Liability Under the U.S. Securities Exchange Act of 1934— Carrie Borgen, Ricardo Antonio Barbosa, James Mack, and John P. Mooney)**

87.     SWI realleges and incorporates herein by reference all of the other allegations set forth in this Complaint.

88.     Carrie Borgen, Ricardo Antonio Barbosa, James Mack, and John P. Mooney are "control person" for purposes of 15 U.S.C. §78t(a).

89.     Indeed, they directly or indirectly controlled AGT and AGT Soft Wave in the perpetuation and communication of the false statements outlined in this Complaint and for which AGT and AGT Soft Wave are liable under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

90.     Accordingly, Carrie Borgen, Ricardo Antonio Barbosa, James Mack, and John P. Mooney are jointly and severally liable with and to the same extent as AGT and AGT Soft Wave for their violations of Section 10(b) and Rule 10b-5.

**FIFTH CLAIM FOR RELIEF**

**(Fraudulent Concealment—All Defendants)**

91.     SWI realleges and incorporates herein by reference all of the other allegations set forth in this Complaint.

92.     As set forth above, Defendants withheld the true value of AGT's stock, its liabilities, and assets.

93.     Based upon the Defendants' statements, SWI purchased AGT stock in return for SWI's Assets.

94.     The Defendants did not disclose the actual value of AGT's stock to SWI.  Indeed, SWI was never told that AGT's stock was actually worth half the $.99 per share represented to SWI.

95.     Nor did Defendants disclose AGT's liabilities, as set forth in Exhibit 4 to this Complaint, or its assets, as set forth in Exhibit 3.

96.     Defendants knew of the material representations and omissions yet failed to disclose to the Plaintiff all of the information regarding AGT's stock value, assets, and liabilities and attempted to conceal this information in an effort to induce SWI to part with its Assets.

97.     SWI reasonably relied upon the Defendants' statements to SWI's detriment.

98.     As a result of their conduct, the Defendants damaged SWI in an amount to be determined at trial, plus interest, attorneys' fees and costs.

## SIXTH CLAIM FOR RELIEF

### (Fraud, Deceit, and Negligent Misrepresentation—All Defendants)

99.     The Plaintiff realleges and incorporates herein by reference all of the other allegations set forth in this Complaint.

100.    Based upon the Defendants' statements outlined above, SWI purchased AGT stock in return for its Assets.

101.    The Defendants misrepresented and did not disclose the actual value of AGT's stock to SWI.  Indeed, SWI was never told that AGT's stock was actually worth half the $.99 per share represented to SWI.

102.    Nor did the Defendants disclose AGT's actual liabilities or assets.

103.    Furthermore, Defendants misrepresented that: (a) upon the acquisition of the Patent and the Assets, AGT's stock price would immediately jump to between $10 and $15 per share; (b) AGT had lined up contracts with three power plants who were ready to sign with AGT as soon as AGT acquired the Patent and executing the joint venture; (c) AGT had lined up investors who were ready to invest substantially in AGT as soon as AGT acquired the Patent and executing the joint venture; (d) AGT was ready to deploy the Equipment worldwide as soon as AGT acquired the Patent and executing the joint venture; and (e) Gary Wilson would receive royalties from the Patent and profits from the joint venture.

104.    Defendants not only knew of their material misrepresentations, but failed to disclose to the Plaintiff the truth regarding, among other things, AGT's stock value and AGT's assets and liabilities.

105.    AGT made the affirmative misrepresentations and omissions in an effort to induce SWI to part with its Assets.

106.    The Defendants made the above misrepresentations and omissions with the intent of inducing SWI to purchase the artificially overvalued AGT stock.

107.    Each of the representations and omissions was knowingly made with the intent to mislead SWI.

108.    SWI reasonably relied upon the Defendants' statements by using the Assets to purchase AGT's stock to SWI's detriment.

109.    SWI would not have purchased the AGT stock had it known of the falsity of the material misrepresentations or had it known of the material facts which Defendants omitted or intentionally chose not to disclose to SWI.

110.    As a direct and proximate result of Defendants' fraudulent representations, SWI has suffered and will continue to suffer general and consequential damages in an amount to be determined at trial, plus interest, attorneys' fees and costs.

111.    The Defendants acted in a wanton, willful, malicious, intentional, and/or bad faith manner.  Accordingly, SWI is entitled to punitive damages in an amount to be established at trial and in an amount to punish and deter such action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SWI requests a jury trial on all claims raised in this Complaint and seeks relief as follows against AGT,  AGT Soft Wave, Carrie Borgen, Ricardo Antonio Barbosa, James Mack, and John P. Mooney (collectively, the "Defendants"):

1.      For an award of general and consequential damages in favor of SWI and against Defendants, jointly and severally, in an amount to be determined at trial;

2.      For an award of punitive damages;

3.      For an award of Plaintiff's attorneys' fees and costs; and

4.      For such other and further relief as the Court deems equitable, just, and proper.

DATED this 27th day of October, 2016.

KIRTON McCONKIE


/s/Brinton M. Wilkins
Brinton M. Wilkins
*Attorneys for Defendants/Counterclaimants*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4820-3779-2057